Filed 6/4/26  P. v. Parra CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>FRANCISCO ARGENIS PARRA,<br><br>　　Defendant and Appellant. | B345972<br><br>(Los Angeles County<br>　Super. Ct. No. VA114995) |

APPEAL from an order of the Superior Court of Los Angeles County, Maria Davalos, Judge.  Affirmed.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Thomas C. Hsieh, Deputy Attorney General, for Plaintiff and Respondent.

In 2014, a jury convicted defendant and appellant Francisco Argenis Parra (appellant) of first degree murder, among other crimes. In 2019, appellant filed a resentencing petition under Penal Code section 1170.95 (now 1172.6).[1] Following an evidentiary hearing, the trial court denied the petition, finding appellant was a major participant who acted with reckless indifference to human life. We affirm.

## FACTUAL BACKGROUND[2]

I. *Trial Testimony*

Hector Arciga, Pedro Huerta Zuniga, and appellant had a scheme to rob drug dealers. After gaining a drug dealer's trust by making an initial small purchase, they would set up a larger purchase. During this second encounter, they would rob the dealer of both the money and the drugs. Here, the robbery during the second purchase resulted in the killing of one dealer and the injury of another.

Jesus Vasquez testified he was a close friend of the dead victim, Carlos Zarate. About a week and a half before Zarate's murder, Vasquez was present when Zarate sold 20 pounds of marijuana to appellant and Zuniga. On April 22, 2009, the day of the second purchase, Vasquez, Martha Gutierrez (his mother-in-law), Zarate, and Manuel Rojas went to an apartment in Bellflower to sell 140 pounds of marijuana to appellant and Zuniga. The dealers brought 60 pounds of the drug with them and planned to deliver the remainder after receiving the money.

---

[1] All undesignated statutory references are to the Penal Code.

[2] We grant appellant's request for judicial notice of the appellate record from his direct appeal in case No. B258201. The facts are taken from our opinion and the record in that appeal.

2

Appellant initially waited outside the apartment while Zuniga and Arciga went inside, but by the time the parties started exchanging drugs and money, appellant was also inside. Arciga checked the product while Gutierrez started counting the money, which was wrapped in plastic. She asked Vasquez to assist her. As Vasquez was walking toward Gutierrez, someone said, "This is a stick up."

All the "buyers" pulled out their guns. Vasquez saw Zuniga pull a handgun from his waist. He then heard several gunshots and saw Zarate staggering. Vasquez also saw Arciga shooting at Zarate while walking towards him. After Zarate had fallen to the ground, Arciga fired five more shots at him. Zuniga snatched the money from Gutierrez. At around the same time, Vasquez heard Rojas screaming. After another gunshot, Vasquez observed Rojas on the floor.

Appellant took the bag containing the marijuana and handed it to Zuniga. Zuniga then dragged the bag to the exit. Vasquez did not see Arciga but presumed that he had already left the apartment. Appellant, who was armed with a semi-automatic handgun, pointed it at Vasquez[3] and asked Vasquez if he had a gun. Vasquez told him, "No," and lifted his shirt to show he was not armed. Gutierrez interposed herself between appellant and Vasquez. As appellant turned to leave, he struck Rojas, who was still on the ground, on the top of the head with his gun.

After appellant left, Vasquez ran toward Zarate's body and started screaming to wake him up. He noticed a .45-caliber handgun on top of the body. Vasquez recognized that the gun belonged to him and took it. He subsequently disposed of the gun. Vasquez, Gutierrez, and Rojas then left

---

[3] As noted below, Gutierrez recalled seeing Zuniga pointing a gun at Vasquez.

3

the apartment. Vasquez did not call 911 after the shooting or contact the police. Instead, the police contacted him later.

Rojas's and Gutierrez's trial testimony was substantially similar to Vasquez's testimony. Rojas testified that he realized it was a setup when Gutierrez was counting the stacks of money, and there were large bills on top of the stacks and $1 bills underneath. At almost the same instant, Rojas heard someone say, "This is a stick up." He saw Zarate reach for his gun, but Zarate did not have enough time to pull it out before he was shot. After Zarate fell to the ground, Gutierrez yelled out, "Oh, my God. Run. Run." Rojas panicked and ran toward the front door. Arciga then shot him in the left buttock, and Rojas fell to the ground. He closed his eyes and pretended to be dead. He heard people walking out and dragging the bag of drugs with them. As the last person left, someone pistol-whipped Rojas. From their positions in the apartment, Rojas deduced that it was appellant who had pistol-whipped him.

After the men left, Gutierrez had someone drive Rojas to a nearby hospital, where he underwent surgery to repair a shattered left femur. Police officers interviewed Rojas at the hospital; he told them he had been shot in a drive-by shooting by unknown assailants. However, Rojas, who was working as an informant for the Drug Enforcement Administration (DEA), called his handler that day and informed the DEA agent about what had happened. A few days later, Los Angeles Sheriff's Department detective Steven Blagg met with Rojas. Rojas described the events to the detective. Deputy sheriffs recovered a blue canvas duffle bag from the apartment, which contained a plastic bag with plastic zip ties and pieces of clear Saran-wrap type plastic.

Gutierrez testified that when the shooting started, she covered her face. Later, she saw Zuniga pointing a gun at Vasquez. She went over and pushed

4

the gun away from Vasquez's face. Gutierrez did not know that Zarate had died until she was informed a few days later. She did not go to the police. Instead, the police contacted her.

Eusebio Alvarez, a friend of Arciga's, testified about certain statements Arciga and Zuniga made to him after the shooting. Previously, Arciga had told Alvarez that appellant's father was involved in "dope rips"—robbing drug dealers. On April 22, 2009, Arciga called Alvarez, saying, "I got some weed right now, but you got to let me know if you want it because something went wrong right now. It's hot. I just shot somebody." Later that day, Arciga came to Alvarez's house with some marijuana. Arciga asked Alvarez if Alvarez could "get rid of [the drugs] quick or something because it was real hot." Arciga said he had been involved in a shoot-out: he had shot a man and after the man fell to the ground, he had walked up and shot him several times. Arciga said Zuniga and appellant were present. Alvarez testified he did not sell any of the marijuana for Arciga. However, for $100, he helped Arciga dispose of a nine-millimeter handgun Arciga said he had used to kill the man.

A few days later, Zuniga contacted Alvarez, saying he had some crystal methamphetamine he wanted Alvarez to sell. Zuniga admitted there had been a shoot-out but said Arciga had lied about shooting the victim. He bragged, "[Arciga] is talking all this bullshit. I was the one that did it. I'm the one that shot the guy."

Maria Eduvina Arteaga de Ayala (Ayala) testified that she lived in the apartment where the shooting occurred. About a week before the shooting, Arciga and "Miguel" asked about using her apartment to host two people visiting from Mexico. Arciga also asked her if she wanted to work with them as a driver. He showed her a box of cash and a handgun. On April 22, 2009,

5

the day of the shooting, Miguel called her and stated they wanted her apartment "empty." Ayala left the apartment, leaving the door unlocked. As she was driving away from her apartment that morning, she observed Arciga driving in the opposite direction. Later that day, the manager of the apartment complex called Ayala, and told her there was a dead man in her apartment. When Ayala was later interviewed by Detective Blagg, she initially lied before telling him the truth. Ayala testified she did not want to work with Arciga, and she never gave anyone permission to use her apartment to engage in drug deals or to rob drug dealers.

On November 10, 2009, appellant was stopped by police for speeding. He was arrested for driving without a license and the vehicle was impounded. During the inventory search of the vehicle, two handguns were recovered from the trunk, including a nine-millimeter Sig Sauer. Appellant told the police officer that he was going to meet and rob a drug dealer of 200 pounds of marijuana. He admitted being involved in a prior robbery of a drug dealer, at "32nd and Central" in Los Angeles.

A coroner testified that he performed an autopsy on Zarate's body. Zarate had suffered nine gunshot wounds, including three that he opined were fatal. A criminalist testified about firearm-related evidence recovered at the crime scene. From various tests, the criminalist concluded that three firearms were used during the shoot-out: (1) a .45-caliber handgun that fired a single shot, (2) a nine-millimeter handgun that fired eight shots, and (3) a nine-millimeter Sig Sauer—the handgun recovered from appellant's vehicle— that fired one shot. A bullet recovered from Rojas's body was matched to bullets fired from the Sig Sauer handgun, and two bullets recovered from Zarate's body were matched with the bullets fired from the other nine-millimeter handgun.

6

A latent print examiner testified that he matched latent prints developed from evidence found at the crime scene with fingerprint exemplars from appellant and Zuniga. Prints on the plastic bag containing zip ties matched appellant's right ring finger. Another criminalist testified that analysis of DNA found on certain items at the crime scene indicated that multiple people handled the items. Based on their respective DNA profiles, Arciga and Zuniga were possible contributors to the DNA mixture found on some of the items, including the Saran-wrap and the duffle bag.

On March 31, 2010, Detective Blagg and two fellow officers interviewed Arciga following his arrest on an unrelated crime. Arciga told the officers he had been acquainted with appellant and appellant's father for about two years. According to Arciga, appellant's father was involved in robbing drug dealers. Arciga acted as a lookout during two of these robberies. On one occasion, Zuniga was present. Arciga said that by April 2009, he was no longer working with appellant's father or Zuniga. He also denied knowing Zarate and initially denied ever being in Bellflower. After being informed that he had been identified by several witnesses as a shooter during Zarate's murder and that his cellphone had been used in Bellflower on April 22, 2009, Arciga conceded that he had gone with appellant's father on a drug deal and that they may have gone to Bellflower.

After further questioning, Arciga admitted to going to an apartment in Bellflower with appellant's father, appellant, and Zuniga to rob drug dealers. Arciga was not armed, but appellant's father and Zuniga were armed with pistols. At the apartment, they met four drug dealers—a woman and three men—who brought 60 pounds of marijuana. Arciga checked the product while the woman counted the money. He heard some commotion and looked up. He saw one of the male drug dealers pull out a pistol, and almost

7

simultaneously Zuniga pulled out his gun. Arciga did not see Zuniga shooting; he just heard shots. Arciga ran out of the apartment with the bag of drugs. As he did so, he saw the drug dealer with the pistol fall to the ground.

## PROCEDURAL HISTORY

I.  *Convictions and Sentence*

Appellant was tried with Arciga and Zuniga. In 2014, a jury found appellant guilty of first degree murder of Zarate (§ 187, subd. (a), count 1), attempted murder of Rojas (§§ 664/187, subd. (a), count 2), assault with a deadly weapon of Rojas (§ 245, subd. (b), count 3), home invasion robbery of Zarate, Rojas, Gutierrez, and Vasquez (§ 211, counts 6-9), and first degree burglary (§ 459, count 10). The jury further found true the special circumstance allegations that the murder was committed in the commission of a burglary and a robbery. (§ 190.2, subd. (a)(17).) As to count 1, the jury found true that appellant personally used a firearm (§ 12022.53, subd. (b)). As to counts 3 and 10, the jury also found true that appellant personally used a firearm (§ 12022.5, subd. (a)) and inflicted great bodily injury (§ 12022.7, subd. (a)). As to counts 2, 6, 7, 8, and 9, the jury further found that he personally and intentionally discharged a firearm which caused great bodily injury and death to Zarate (§ 12022.53, subds. (b), (c), & (d)). The trial court sentenced appellant to life imprisonment without the possibility of parole, plus 40 years, in state prison.

On appeal, this court affirmed the judgment. (*People v. Arciga*, B258201) [nonpub. opn.].)

II.     *Resentencing Petitions*

In 2019, appellant filed a resentencing petition under section 1170.95 (now 1172.6).  The trial court summarily denied the petition for failing to make a prima facie showing that he was eligible for relief.  On appeal, this court reversed the order and remanded the matter for further resentencing proceedings.  (*People v. Parra* (Dec. 11, 2020, B299312 [nonpub. opn.].).)

In 2021, the trial court found a prima facie case, issued an order to show cause, and appointed counsel for appellant.  Following briefing and an evidentiary hearing, the court denied the resentencing petition.  The court found appellant ineligible for relief because he was a major participant who acted with reckless indifference to human life.

As to the finding that appellant was a major participant in the underlying felonies, the court explained that he "had a major role in planning this criminal enterprise that [began] a week before [the murder]."  The court stated appellant was armed with a firearm, albeit there was no evidence he supplied weapons to his codefendants.  Appellant knew of the particular dangers involved in a burglary and a robbery.  He and his codefendants brought zip ties and firearms to aid in quelling any resistance or fight.  Moreover, when appellant was later arrested by police, they recovered zip ties and two guns in his vehicle.  The court found that this demonstrated "his continued subjective knowledge of the dangers inherent in the business that he engages in."  Not only was appellant present at the scene of the crimes, but the court found he facilitated the murder.  Appellant drew his firearm as soon as one of his codefendants stated, "this is a stick up."  At no time did appellant say, "don't shoot."  Instead, appellant checked Vasquez for any guns and hit Rojas on the head with his firearm.  The court found appellant's actions made "sure that the sellers d[id] not resist."  The court further found

9

appellant did not provide aid to the murder victim, and instead he "stayed on task."

As to reckless indifference to human life, the court found that appellant used a firearm in the commission of the felonies and it was also "clear he was not surprised one bit by the fact that the other defendants used guns." When appellant was later interviewed about the murder, he did not dispute it was part of the plan and "in no way was he shocked." In addition, appellant and his codefendants were all armed during the commission of the felonies. Again, the court found that appellant was not only present at the crime scene but facilitated the murder and failed to render aid to the victim. The court acknowledged that the actual murder was short in duration, however, the court noted the planning started a week prior. The court conceded there was no evidence that his fellow codefendants had a propensity for violence. The court reiterated that appellant did not minimize the risk of violence during the commission of the felonies.

Appellant timely appealed.

## DISCUSSION

I.   *Senate Bill No. 1437 and Standard of Review*

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) and subsequent related legislation limited accomplice liability under the felony-murder rule, eliminated the natural and probable consequences doctrine as it relates to murder, and eliminated convictions for murder based on a theory under which malice is imputed to a person based solely on that person's participation in a crime. (See generally *People v. Reyes* (2023) 14 Cal.5th 981, 986; *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020)

10 Cal.5th 830, 842–843 (*Gentile*), superseded by statute on another ground as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.)

Senate Bill 1437 added section 188, subdivision (a)(3), which provides that "to be convicted of murder, a principal in a crime shall act with malice aforethought" and malice "shall not be imputed to a person based solely on his or her participation in a crime." Senate Bill 1437 also amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of qualifying felonies is liable for felony murder only if the person (1) was the actual killer, (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor, or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d). (*Gentile, supra*, 10 Cal.5th at p. 842.)

Senate Bill 1437 created a procedure, now codified at section 1172.6, for a person convicted of murder under the former law to be resentenced if the person could no longer be convicted of those crimes under current law. (*People v. Lewis, supra*, 11 Cal.5th at p. 959; *Gentile, supra*, 10 Cal.5th at p. 847.) A defendant commences that procedure by filing a petition containing a declaration stating, among other things, that the defendant could not presently be convicted of murder under current law. (*People v. Strong* (2022) 13 Cal.5th 698, 708.)

If a petition establishes a prima facie case for relief, the trial court must appoint counsel if requested, issue an order to show cause, and hold an evidentiary hearing at which the parties may offer new or additional evidence. The trial court sits as an independent factfinder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a

11

valid theory. (§ 1172.6, subds. (b)(3), (c), & (d)(1); *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

We review a trial court's findings after a section 1172.6, subdivision (d)(3) evidentiary hearing for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

II.    *Major Participant Who Acted With Reckless Indifference to Human Life*

At an evidentiary hearing to determine whether a defendant was a major participant who acted with reckless indifference to human life, a trial court must consider the factors identified in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

First, the court must determine "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty." (*Banks*, *supra*, 61 Cal.4th at p. 794.) In making this determination, the court should consider the following factors: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

Second, factors to consider when determining reckless indifference are: "Did the defendant use or know that a gun would be used during the felony?

How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 [summarizing *Clark* factors].)

Ample evidence supports the trial court's finding that appellant was a major participant. As described in detail by the trial court, appellant engaged in an orchestrated plan to commit the underlying felonies. This plan was set in motion a week prior to the murder. Appellant first participated in a drug sale with the murder victim as a pretense for a larger sale and a means to develop trust with the drug dealers. Appellant helped pack the duffel bag of zip ties and wrap the money that was to be used in the second drug purchase. At the time of the murder, appellant was present, armed, and ready to use lethal force to assist with the robbery and the burglary. Appellant was aware his cohorts were armed and did not act surprised when they all displayed their weapons. Furthermore, appellant was in a position to prevent the murder but did nothing to stop it. He did not provide any aid to the victim or call the police after the incident. As the trial court put it, appellant "stayed on task." Later, appellant was arrested while on his way to rob another drug dealer with zip ties and guns in his vehicle, which further demonstrated his knowledge of the inherent dangers of robbing drug dealers.

Substantial evidence also demonstrates appellant acted with reckless indifference to human life. Not only did appellant carry a gun himself, but he also knew his cohorts were armed. Again, appellant was present at the time

13

of the murder and failed to do anything to stop it or de-escalate the situation. As noted, appellant did not express shock that firearms were used during the commission of the felonies. He also could have, but failed to, render aid to the victim. Instead, he pointed his firearm at Vasquez, hit Rojas with his firearm, and helped carry the drugs out of the apartment.

The totality of the *Banks*/*Clark* factors support the trial court's finding that appellant was a major participant in the underlying felonies who acted with reckless indifference to human life under current law. (See generally *Tison v. Arizona* (1987) 481 U.S. 137, 158 [Tison brothers' "high level of participation" in kidnapping and robbery "implicates" them in culminating murder of a family].)

## DISPOSITION

The order denying appellant's section 1172.6 resentencing petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ZUKIN, P. J.

WE CONCUR:

MORI, J.

TAMZARIAN, J.

14